833 So.2d 306 (2003)
Joel W. ROBBINS, as Property Appraiser of Miami-Dade County, Florida, and Department of Revenue, State of Florida, Appellants,
v.
RACETRACK TRAINING CENTER, INC., Appellee.
No. 3D02-1596.
District Court of Appeal of Florida, Third District.
January 2, 2003.
*307 Robert A. Ginsburg, County Attorney, and Melinda S. Thornton, Assistant County Attorney, for Appellant Miami-Dade County.
Robert A. Butterworth, Attorney General, and Mark T. Aliff, Assistant Attorney General, for Appellant Department of Revenue, State of Florida.
Greenberg Traurig, Alan T. Dimond and Benjamin L. Reiss, Miami, for Appellee.
Before SCHWARTZ, C.J., and COPE and GODERICH, JJ.
GODERICH, Judge.
Joel W. Robbins, as Property Appraiser of Miami-Dade County, Florida [Property Appraiser], and the Department of Revenue, State of Florida [Department of Revenue], appeal from an adverse final summary judgment. We affirm.
On January 1, 1998, Racetrack Training Center, Inc. [Racetrack] was the legal titleholder of record of 13.65 fenced acres [the Property] in Miami-Dade County. For the tax year 1998, Racetrack applied to the Property Appraiser for agricultural classification of the Property on the basis that it was used exclusively for the business of training and housing thoroughbred racing horses. The Property Appraiser denied the application for agricultural classification finding that the Property was not used for "bona fide agricultural purposes." The Property Appraiser placed a preliminary assessment upon the Property at the non-classified value of $615,708.00.
Racetrack filed a petition with the Miami-Dade County Value Adjustment Board contesting the Property Appraiser's denial of the agricultural classification. A Special Master heard the petition and recommended granting the agricultural classification. The Value Adjustment Board adopted the Special Master's recommendation and granted the agricultural classification. Consequently, the assessed value of the Property was reduced from a non-classified value of $615,708.00 to a classified value of $364,741.00.
The Property Appraiser then filed suit against Racetrack and the Department of Revenue seeking reinstatement of the non-classified assessment. The parties submitted an amended stipulated statement of facts and filed cross-motions for summary judgment. The facts are summarized below.
In 1984, Racetrack purchased the Property for approximately $753,000.00. Since 1985, the Property was used exclusively as a for-profit business to board and train thoroughbred racing horses. In furtherance of its business, Racetrack made improvements to the Property. By January 1, 1998, Racetrack had constructed a practice racetrack and an equine swimming pool. These improvements were used exclusively by the horses housed and/or trained on the Property and horses housed next door at Calder Race Course.
*308 In operating its training center, Racetrack employed two regular full-time employees, as well as seven to nine independent contractors. On a daily basis, these employees groomed and cleaned the horses, bandaged and applied various medications to their legs, fed them two to three times a day, and exercised them on the practice track and in the equine swimming pool.
In addition, these employees cared for the land by mowing, harrowing, reforesting, trimming, and grading. Racetrack utilized approximately fifty-five employee hours a week to care for the land and the training facility. Racetrack also stored wood shavings on the Property that were used for bedding the horses.
In addition to operating the training center, Racetrack also rented stall space to others who housed their thoroughbred racing horses on the Property. Other trainers had employees that worked on the Property and took care of those horses.
Racetrack also bought, developed, trained, housed, and then resold thoroughbred racing horses. As of January 1, 1998, five such horses were housed and trained on the Property. In 1998, Racetrack's federal income tax return showed a gross income of $639,166.00, $122,737.00 of which was attributable to the sale of horses.
As of January 1, 1998, there were approximately fifty to sixty thoroughbred racing horses living on the Property. Some were being housed and trained by Racetrack, while others were living in stall space rented from Racetrack. In June 1998, there were 108 thoroughbred racing horses living on the Property.
The Property also housed goats and, on average, fifteen to twenty ponies, to help keep the highly emotional racing horses relaxed, calm, trainable, and capable of engaging in a horse race. At other times, including in 1998, Racetrack also boarded chickens, rabbits, and ducks.
Racetrack did not use the Property for breeding horses, nor did it offer breeding services thereon. Racetrack was not licensed or certified as a horse seller, dealer, or breeder.
On February 28, 2002, the trial court conducted a hearing on the cross-motions for summary judgment. On May 21, 2002, the trial court entered an order granting Racetrack's motion for summary judgment, denying the Property Appraiser's motion, and finding that the Racetrack's use of the Property was a bona fide agricultural purpose entitled to agricultural classification. The Property Appraiser and Department of Revenue appeal from the entry of final summary judgment.
The Property Appraiser and the Department of Revenue contend that the trial court erred, as a matter of law, by granting summary judgment in favor of Racetrack and classifying the Property as agricultural. They argue that the primary use of the property, horse boarding and training, was not a bona fide agricultural purpose. We disagree.
Section 193.461, Florida Statutes (1997), provides, in pertinent part:
Agricultural lands; classification and assessment.
* * *
(3)(b) [O]nly lands which are used primarily for bona fide agricultural purposes shall be classified agricultural. "Bona fide agricultural purposes" means good faith commercial agricultural use of the land. In determining whether the use of the land for agricultural purposes is bona fide, the following factors may be taken into consideration:
1. The length of time the land has been so utilized;

*309 2. Whether the use has been continuous;
3. The purchase price paid;
4. Size, as it relates to specific agricultural use;
5. Whether an indicated effort has been made to care sufficiently and adequately for the land in accordance with accepted commercial agricultural practices, including, without limitation, fertilizing, liming, tilling, mowing, reforesting, and other accepted agricultural practices;
6. Whether such land is under lease and, if so, the effective length, terms, and conditions of the lease; and
7. Such other factors as may from time to time become applicable.
* * *
(5) For the purpose of this section, "agricultural purposes" includes, but is not limited to, horticulture; floriculture; viticulture; forestry; dairy; livestock; poultry; bee; pisciculture, when the land is used principally for the production of tropical fish; aquaculture; sod farming; and all forms of farm products and farm production.
(emphasis added).
In examining the meaning of section 193.416(3)(b), the Fourth District has stated:
The term `primarily' simply signifies that the agricultural use must be the most significant activity on the land where the land supports diverse activities. The terms `bona fide' as used in the statute impose the requirement that the agricultural use be real, actual, of a genuine natureas opposed to a sham or deception.
Aitken v. Markham, 595 So.2d 159, 161 (Fla. 4th DCA 1992)(quoting Gianolio v. Markham, 564 So.2d 1131, 1133 (Fla. 4th DCA), review denied, 569 So.2d 1279 (Fla. 1990) (citations omitted)).
In the instant case, there are no allegations that Racetrack's use of the Property for boarding and training thoroughbred racing horses was not the primary use or that such use was a sham. Rather, the Property Appraiser and the Department of Revenue contest the agricultural classification on the basis that section 193.416(5) defines "agricultural purposes" to include "livestock ... and all forms of farm products and farm production." They argue that the latter phrase operates to limit the term "agricultural purposes" to situations where the property owner is raising or producing livestock. In support thereof, the Property Appraiser and Department of Revenue rely on Aitken where agricultural classification was granted to a property owner who bred and raised Dutch Warmblood jumping horses.
Racetrack vehemently opposes this position and properly argues that statutes must be given their plain meaning. The statute in question merely states that "`agricultural purposes' ... includes ... livestock...." We find that the phrase, "all forms of farm products and farm production," is not meant to be a limiting phrase but rather a catch-all. Further, when the legislature wanted to limit a category, it did so as is exemplified by its limitation on pisciculture to situations "when the land is used principally for the production of tropical fish." § 193.461(5), Fla. Stat. (1997). Therefore, we must look at the plain meaning of the term "livestock." Although not specifically defined in section 193.461 or related sections, the term "livestock" has been defined consistently throughout the Florida Statutes to include "horses." See § 212.02(29), Fla. Stat. (1998 Supp.); § 585.01(13), Fla. Stat. (1997); § 588.13(1), Fla. Stat. (1997); § 828.23, Fla. Stat. (1997); Aitken, 595 *310 So.2d at 161 (finding that "livestock" as defined in the Florida Administrative Code includes horses).
For these reasons, we conclude that the record supports the trial court's conclusion that for the calendar year 1998, Racetrack's primary use of the Property was for the bona fide agricultural purpose of boarding and training thoroughbred racing horses.
Accordingly, we affirm the entry of final summary judgment.